IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| FARIDA ALLY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. _____ |
| | § | |
| ORTHOPEDIC HOSPITAL LTD d/b/a TEXAS | § | |
| ORTHOPEDIC HOSPITAL, | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF'S SWORN ORIGINAL COMPLAINT**

Farida Ally ("Plaintiff" or "Ally"), files her Sworn Original Complaint against Orthopedic Hospital LTD d/b/a Texas Orthopedic Hospital ("TOH"), showing as follows:

**I.  SUMMARY**

1.      This is an Americans with Disabilities Act ("ADA") case.

2.      Ally is a lifetime asthmatic.  Notwithstanding her asthma, between 2005 and mid-2010, TOH's management reasonably accommodated Ally, and she worked effectively as a nurse at TOH without harming herself, TOH's patients, or anyone else.  Year after year, TOH and its patients consistently commended Ally in writing for her outstanding job performance (Ex. A).

3.      In mid-2010, TOH's management changed.  TOH's new management reflexively revoked the prior management's reasonable accommodations.  They then raced to the logically unsupportable, and legally incorrect, conclusion that Ally's asthma posed a "direct threat" to her safety when she worked in TOH, even though Ally had worked safely in TOH for the prior five years.  Based on that inherently inconsistent and erroneous conclusion, TOH's new management fired Ally on August 20, 2010.

4.     Ally filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging a failure to accommodate and disability discrimination under the ADA.  In response, TOH defended its termination of Ally solely by relying on the ADA's "direct threat" defense – a long-shot affirmative defense that could not possibly apply here, where Ally had worked safely as a nurse at TOH for five years, and as a nurse at prior and subsequent employers since 1993.  In short, Ally was fired by TOH in violation of the ADA, and TOH's Hail Mary "direct threat" defense is a clear loser.

## II.  THE PARTIES AND JURISDICTION

5.     The Plaintiff, Farida Ally, is a natural person residing in Fort Bend County, Texas.  She was employed by TOH located at 7401 South Main Street, Houston, Texas 77030.  Ally has standing to file this lawsuit.

6.     Defendant, Orthopedic Hospital LTD d/b/a Texas Orthopedic Hospital, is headquartered at 7401 South Main Street, Houston, Texas 77030.  TOH may be served with process through its registered agent, CT Corporation System, 350 N. St. Paul Street, Suite 2900, Dallas, Texas 75201-4234.

7.     The Court has personal jurisdiction over TOH based on both general and specific jurisdiction.

8.     The Court has subject matter jurisdiction over this case based on federal question jurisdiction under the ADA.  The Court has supplemental jurisdiction over Ally's claim under the Texas Labor Code.

### III.  FACTUAL BACKGROUND

**A.    In 2005, TOH Hired Ally And Reasonably Accommodated The Workplace Limitations Caused By Her Asthma For Nearly Five Years**

9.     Ally began her employment as a Registered Nurse with TOH, in Houston, Texas on or about August 1, 2005.

10.    HCA, Inc. owns TOH.   According to its website, HCA owns and operates approximately 163 hospitals and approximately 105 freestanding surgery centers in 20 states and London, England.   HCA owns and operates a number of other hospitals in the Houston, Texas, area that employ registered nurses.   HCA regularly transfers employees from one HCA facility to another.

11.    Ally has a lifelong disability, asthma.   She has taken numerous prescription medications to combat and control her asthma.   Despite her disability, Ally had worked as a registered nurse in multiple hospitals since 1993.

12.    During the hiring process at TOH, Ally informed Diane Anderle, then Unit Manager, of her asthma and the circumstances that may trigger an attack, including strong odors, such as those from harsh cleaning chemicals.   TOH correctly recognized, at that time, that Ally's disability related workplace limitations did not preclude her from performing the essential functions of a registered nurse.   Based on that assessment, TOH hired Ally in June 2005.

13.    From the date she was hired, TOH, through Unit Manager Diane Anderle, Chief Nursing Officer Tana Burton, and other employees, reasonably accommodated Ally's workplace limitations caused by her asthma.   They did this by doing such things as:

> (i)     scheduling her to be off work when heavy cleaning was to be done;
>
> (ii)    temporarily transferring her to another floor during times of construction or heavy cleaning on her typically assigned floor;

> (iii)    having a Respiratory Therapist provide breathing treatments using a nebulizer when necessary;
>
> (iv)    maintaining a FMLA certification of serious health condition throughout the years and allowing her to take job-protected FMLA leave when necessary (Ex. B); and
>
> (v)    on occasion, co-workers would switch responsibility for certain patients' rooms.

14.    At no time between 2005 and 2010 did these accommodations impose any undue hardship on TOH.

15.    Based on the aforementioned reasonable accommodations, Ally was able to perform for TOH and its patients at a high level.  Over the next approximately five years Ally consistently received outstanding performance reviews from TOH, and constant, glowing praise from the patients she dealt with and cared for on a daily basis (Ex. A).  In short, from 2005 until 2010, Ally was, by TOC's own measure, a model employee who more than adequately safely performed the essential job functions of her job with the reasonable accommodations (Ex. A).

**B.    In 2010, TOH Brought In New Management, And They Revoked The Reasonable Accommodations, And Raced To The Illogical And Incorrect Conclusion That Ally Was A Direct Threat To Her Own Safety**

16.    In 2010, TOH brought in new management.  Unit Manager Diane Anderle was terminated and replaced by Caroline Stewart.  Chief Nursing Officer Tana Burton was terminated and replaced by Troy Sarver.  During the same time period, a new HR Director named Randy Greathouse was brought in.  Regrettably, as their actions would soon demonstrate beyond cavil, none of these people understood or adhered to the ADA's requirements.

17.    In mid-2010, TOH was preparing for a governmental review.  As part of its preparations, and as it had done in previous years, TOH was doing a lot of cleaning with harsh chemicals, painting with strong paints, and replacing carpet using strong smelling glue. Most of the cleaning was being done on the weekends.  Ally was scheduled to work weekends at the

-4-

time, and, as a result, her asthma was worsening.  At the time, in May 2010, Ally's doctor, Dr. Maurico A. Reinoso, had written a letter stating "[t]his is a letter written at the request of the patient; Mrs. Farida Ally is a patient of mine and is diagnosed with severe asthma.  She needs to avoid exposure to chemical fumes and vapors that can trigger an asthma attack.  If you have questions please feel free to contact my office."  (Ex. C).  Ms. Ally asked for reasonable accommodations to be continued in light of the letter (Ex. D).  Ms. Ally asked for reasonable accommodations in writing from Greathouse (*Id.*).

18.     Because of the situation mentioned in the above paragraph, Ally had also asked Troy Sarver if her schedule could be modified as it had been for the previous five years so that she did not work weekends while this intensive cleaning was going on, as an accommodation for her disability related workplace limitations.  Sarver initially agreed.  And, for the next several workweeks, Ally was not scheduled weekends as a reasonable accommodation.

19.     However, after the next several workweeks, Sharon Owens, the Assistant Unit Manager, told Ally that Sarver had informed Owens that he had never approved for Ally to be scheduled off weekends. Ally professionally confronted Sarver about his 180-degree turn, and Sarver falsely denied ever agreeing to take her off of weekends.  Sarver claimed that to do so would show favoritism.  As a result, Ally was put back on the weekend schedule even though TOH was on crystal clear notice that allowing her off weekends during heavy cleaning was a reasonable accommodation for her asthma related workplace limitations.

20.     During this same time period, TOH began carefully tracking and closely scrutinizing Ally's FMLA time off as a result of her asthma and demanding that she rigorously report all her FMLA time off – something its prior management had never done.  This cynical demand made no sense because Ally had never been accused of abusing her FMLA time off.  To

the contrary, Ally never even used up all or even most of her available twelve weeks of FMLA time in any year, including 2010.

21.     On July 12, 2010, after Sarver retracted the reasonable accommodation of taking Ally off of weekends, Ally went to TOH's Chief Executive Officer ("CEO"), Alice Hopkins Adams, for assistance.  Adams turned the matter over to Mr. Sarver, Ms. Stewart, and Mr. Greathouse and delegated it to them to resolve the matter on behalf of TOH.  That day a meeting was held with those three individuals and Ally.  Remarkably, these individuals said that they did not know how to help Ally.  This is remarkable because: (i) Ally had told Sarver how to help/reasonably accommodate her – by giving her weekends off during the heavy cleaning; and (ii) TOH's own prior management's actions between June 2005 and mid-2010 clearly demonstrated how to help/reasonably accommodate Ally's disability related workplace limitations.  *See supra*.

22.     In the same meeting, when Ally asked about a transfer to another HCA owned facility, which would require management approval, Sarver denied that request, callously and illogically explaining that they did not want to pass TOH's problem on to another facility.  Despite rejecting each of Ally's requests for reasonable accommodation, these individuals irrationally then told Ally, in violation of the ADA's interactive process requirement, that they were relying on her to find a solution.  When Ally offered (yet another) alternative solution of removing harsh cleaning chemicals from TOH and moving to organic cleaning chemicals, as other hospitals across the country had done, Greathouse said he would look into it, but he never spoke to Ally about that idea again.

23.     Instead, TOH began demanding that Ally prove to TOH which of its cleaning solutions in particular she had reactions too.   This is not consistent with the ADA or common

sense.  Nor is it consistent with what Ally herself asked for (Ex. E) (stating in an e-mail to Greathouse dated June 14, 2010, that "I am not asking you to change the cleaning products the facility uses.").  It is, however, consistent with the notion that TOH had set about to try to find a way to fire Ally.  From this point on, TOH incorrectly and irrationally focused on demanding that Ally prove which of its cleaning solutions in particular she had reactions too.  Under the ADA, it should instead have been focusing on how to reasonably accommodate her disability related workplace limitations.

24.     TOH forced Ally to see a doctor it handpicked, allegedly to pursue its irrelevant inquiry about which cleaning chemicals Ally reacted to.  On August 9, 2010, the TOH's handpicked doctor, Dr. David Amran, saw Ally.  But, rather than identify the chemicals Ally reacted to, Dr. Amran instead wrote Sarver, Stewart, and Greathouse a letter stating that Ally is suffering from "severe life threatening asthma and exposure to any chemical respiratory irritant can trigger a severe fatal asthma attack.  We recommend removing patient from work place that has respiratory irritants.  If in fact the patient will continue to be exposed to the above irritants there will be definite further deterioration of her condition." (Ex. F).

25.     Eleven days later, on August 20, 2010, Sarver, Stewart, and Greathouse called Ally into a meeting.  They then told her she was a good employee.  But, they said they were firing her because they could not accommodate her disability.  This statement makes no sense – TOH had reasonably accommodated Ally's disability related workplace limitations for five years, and easily could have continued to do so.

26.     TOH then brought an internal HCA recruiter named Lisa A. Waters into the termination meeting and introduced her to Ally.  Waters gave Ally her business card (Ex. G).  TOH said Ms. Waters could help Ally obtain a job as a registered nurse in another of the HCA

owned hospitals in the Houston area, such as The Women's Hospital of Texas.  This was odd for

at least two reasons.  First, it was odd because Ally had previously suggested an intra-HCA

transfer as an idea and was told by Sarver that was not possible because TOH did not want to

pass TOH's problem on to another facility.   Second, it as odd because if Ally could work at

another HCA-owned hospital facility – as even TOH suggested that she could – then there was

no reason why she should not have been able to continue working at TOH itself.

27.     As it turned out, TOH had apparently used a code in its computer system that

effectively blacklisted Ally within the community of HCA-owned hospitals, and prevented her

from being hired.  Waters could not and did not get Ally a job with any HCA-owned hospital.

28.     After diligent and sustained searching on her own, Ally obtained a new job

working as a nurse for St. Luke's Hospital in Sugar Land, Texas.  Her first day on the new job

was November 14, 2011.  She has not harmed herself or anyone else during her employment at

St. Luke's Hospital.

**C.     Ally Exhausts Her Administrative Remedies**

29.     Ally filed a timely Charge of Disability discrimination with the EEOC and the

Texas Workforce Commission – Civil Rights Division, exhausted her administrative remedies

with both agencies, and brings this timely suit under the ADA and the Texas Labor Code.

**IV.  ADA/TEXAS LABOR CODE FAILURE TO ACCOMMODATE CLAIM**

30.     To state a claim for failure to accommodate under the ADA or Texas Labor Code,

the plaintiff must prove the following elements: (1) that she was an individual who had a

disability within the meaning of the ADA; (2) that the employer had notice of her disability; (3)

that with reasonable accommodations she could perform the essential functions of the position;

and (4) that the employer refused to make such accommodations.  *See Riel v. Electronic Data*

*Systems Corporation*, 99 F.3d 678 (5th Cir. 1997); Fifth Circuit Pattern Jury Instructions–Civil

(2006), Section 11.7.2 ADA–Failure to Accommodate; *Rhoads v. Federal Deposit Ins. Corp.*, 257 F.3d 373, 387 (4th Cir. 2001); *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999).  Ally fulfills each element.

## A.   First Element:  Ally Has A Disability Under The Amended ADA

31.   Under 42 U.S.C. §12102 (1), the term "disability" is defined, in relevant part, as, "a physical or mental impairment that substantially limits one or more major life activities of [an] individual."  Under 42 U.S.C. §12102 (2) major life activities include:

(A)   In general

For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

(B)   Major Bodily Functions

For purposes of paragraph (1), a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

32.   In 2009, statutory revisions to the ADA broadened the definition of disabled. ADA Amendments Act of 2008, Pub.L. No. 110-325, 122 Stat. 3553 (ADAAA) ("The definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act.").  The ADAAA became effective January 1, 2009.  Those amendments were also made to the Texas Labor Code, effective September 1, 2009.

33.   "The ADAAA is principally aimed at reversing Supreme Court precedent perceived as improperly narrowing the scope of protection originally intended by drafters of the ADA." Louis P. DiLorenzo, The Intersection of the FMLA and ADA–As Modified by NDAA,

ADAAA and GINA, 860 PLI/Lit 47, 83–84 (June 23, 2011); 29 C.F.R. § 1630. 1(c)(4) ("reinstating a broad scope of protection under the ADA"; "the definition of 'disability' shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA").  The EEOC emphasized that "the primary object of attention in cases . . . should be whether the covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability." 29 C.F.R. § 1630.1(c)(4).

34.    The ADAAA further states that the intent of these changes is that employers stop engaging in "extensive analysis" to determine what constitutes a disability under the law, and focus instead on complying with their obligation not to discriminate and to provide reasonable accommodations to individuals who are otherwise qualified to do a job.  It also provides the following "[r]ules of construction regarding the definition of disability:

The definition of "disability" in paragraph (1) shall be construed in accordance with the following:

(A)    The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter.

(B)    The term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008.

(C)    An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability.

(D)    An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

(E)(i)  The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as—

(I)    medication, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics

-10-

including limbs and devices, hearing aids and cochlear implants or other implantable hearing devices, mobility devices, or oxygen therapy equipment and supplies . . . .

35.     Here, under the amended ADA and Texas Labor Code, Ally has "a physical or mental impairment that substantially limits one or more major life activities of [an] individual." Her asthma is permanent and it is severe.  Clearly it substantially limits her major life activity of breathing.  This is especially the case if she did not take her prescription medication.  In short, under the amended ADA and Texas Labor Code, there is no doubt that Ally fulfills the first element of this claim. *Cf. Cantrell v. Delta Airlines, Inc*., 2 F. Supp. 2d 1460, 1464 (N.D. Ga. 1998) (finding fact issue over whether asthmatic employee had a disability even under the pre-amendment ADA); *Carbaugh v. Unisoft Intern., Inc*., Civil Action No. H–10–0670, 2011 WL 5553724, at *8 (S.D. Tex. Nov. 15, 2011) (applying ADA's new definition of "disability" and finding there was an issue of fact as to whether the plaintiff had a disability); *Meinelt v. P.F. Chang's China Bistro, Inc.,* 787 F. Supp. 2d 643, 651-52 (S.D. Tex. 2011) (same); *Patton v. eCardio Diagnostics LLC*, 793 F. Supp. 2d 964 (S.D. Tex. 2011) (same); EEOC's Interpretive Guidance Accompanying Its Final Regulations, 76 FR 17011 (Mar. 25, 2011) (listing asthma as a typical episodic impairment that would constitute a disability under the amended ADA).

## B.     Second Element: TOH Had Notice Of Ally's Disability

36.     Notice is not an issue here.  Ally repeatedly gave TOH notice of her disability, resulting workplace limitations, and need for reasonable accommodation.  She told TOH when she was hired in 2005 and TOH was on both initial and repeated verbal and written notice from that time through her termination on August 20, 2010 (Exs. C-E).

C.   **Third Element:  Ally Was A Qualified Individual With A Disability, Because She Could And Did Perform The Essential Functions Of Her Position With Reasonable Accommodation**

37.     This element is proven by TOH's own conduct between June 2005 and mid-2010, during which Ally continued her employment with TOH despite having all the same disability related workplace limitations.  *See Carmona*, 604 F.3d at 859-61.  This is also proven by TOH's own conduct after it fired Ally.  Specifically, at that time, TOH itself brought in and introduced Ally to the internal HCA recruiter named Lisa A. Waters to help Ally obtain a job as a registered nurse in another of the HCA owned hospitals in the Houston area, such as The Women's Hospital of Texas.  If Ally could work at another HCA-owned hospital facility – as even TOH suggested that she could – then there was no reason why she should not have been able to continue working at TOH itself.

38.     Despite Ally's history of success when reasonably accommodated by previous TOH management, TOH decided that Ally was not longer qualified for her position as a Registered Nurse because her disability posed a threat to her health and safety.  This is an affirmative defense that TOH cannot possibly prove.  *Chevron U.S.A., Inc. v. Echazabal*, 536 U.S. 73, 79, 122 S.Ct. 2045, 2049 (2002) (referring to the defense as an affirmative defense); *EEOC v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 571 (8th Cir. 2007) ("[T]he employer bears the burden of proof [on direct threat] as the direct threat defense is an affirmative defense.") (citing *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir. 1999)).

39.     If a disabled individual is excluded from the job for safety reasons, the employer must demonstrate that the individual poses a "direct threat."  "The direct threat defense must be based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence, and upon an expressly individualized assessment of the individual's present ability to safely perform the essential functions of the job." *Chevron*

*U.S.A., Inc. v. Echazabal*, 536 U.S. 73, 86, 122 S.Ct. 2045, 2053 (2002) (internal quotation marks and citation omitted).  A "slightly increased risk is not enough to constitute a direct threat, there must be a high probability of substantial harm." *E.E.O.C. v. Hibbing Taconite Co.*, 720 F. Supp. 2d 1073, 1082 (D. Minn. 2010) (citing *Dipol v. N.Y. City Transit Auth.*, 999 F. Supp. 309, 316 (E.D.N.Y. 1998)).

40.    In determining whether an individual presents a direct threat, the factors to be considered include:

(1)    the duration of the risk;

(2)    the nature and severity of the potential harm;

(3)    the likelihood that the potential harm will occur; and

(4)    the imminence of the potential harm.

29 C.F.R. § 1630.2(r); *see also Wal-Mart*, 477 F.3d at 571.

41.    Finally, to prevail on the "direct threat" affirmative defense, an employer must show that any threat the employee may have posed could not be eliminated by reasonable accommodation. Once the employee requests an accommodation, the employee and employer share the burden of crafting a reasonable accommodation through a flexible, interactive process. *See id*; *see also* 29 C.F.R. § 1630.9; *EEOC v. Chevron Phillips Chemical Co.*, 570 F.3d 606, 621 (5th Cir. 2009).  Specifically, as the Fifth Circuit has held, once an employee makes such a request, the employer is obligated by law to engage in an "interactive process": "a meaningful dialogue with the employee to find the best means of accommodating that disability." *Id*. (citation omitted).  The process thus requires "communication and good-faith exploration."  *Id*. (citation omitted).  If the employer does not engage in a good faith interactive process, and this intransigence leads to a failure to reasonably accommodate an employee, the employer violates

the ADA. *See Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 (5th Cir.1999) (citing *Taylor v. Phoenixville School Dist.*, 174 F.3d 142, 165 (3rd Cir.1999)); *see also Chevron Phillips Chemical Co.*, 570 F.3d at 621-22 (reversing summary judgment for the employer and holding that a reasonably jury could find that the employer failed to properly engage in the interactive process).

42.     Courts have observed that the "direct threat" defense is difficult for an employer to satisfy. As one court stated, "a defendant "asserting a 'direct threat' as a basis for excluding an individual bears a heavy burden of demonstrating that the individual poses a significant risk to the health and safety of others." *Lockett v. Catalina Channel Express, Inc.*, 496 F.3d 1061, 1066 (9th Cir. 2007). Employers very rarely get out of ADA cases on summary judgment based on the "direct threat" defense. *See, e.g.*, *Kapche v. City of San Antonio*, 176 F.3d 840 (5th Cir. 1999) (finding a fact issue over whether insulin-dependent diabetic police officer presented a direct threat); *Rizzo v. Children's World Learning Centers, Inc.*, 84 F.3d 758, 764 (5th Cir. 1996) (reversing summary judgment as to a bus driver with a hearing impairment, and stating that, "[w]hether a person who can hear emergency vehicles, but cannot hear a choking child, is a direct threat is question of fact."); *McCann v. City of Eugene ex rel. Fire and EMS Dept.*, 833 F. Supp. 2d 1250, 1258-59 (D. Or. 2011) (genuine issues of material fact, including whether the possibility of interference or other reasons for pacemaker failure was only theoretical and not significant enough to require any further testing of a city firefighter for purposes of the ADA's "direct threat" provision, precluded summary judgment for city firefighter on the firefighter's discrimination claim against the city.); *Eldredge v. City of St. Paul*, 809 F. Supp. 2d 1011, 1033 (D. Minn. 2011) (genuine issue of material fact existed as to whether firefighter who suffered from Stargardt's Macular Dystrophy posed a direct threat to health and safety of others);

*E.E.O.C. v. Rite Aid Corp.*, 750 F. Supp. 2d 564, 571-72 (D. Md. 2010) (genuine issue of material fact existed as to whether employee with epilepsy posed a direct threat of harm to himself and to his coworkers); *EEOC* v. *Hibbing Taconite Co.*, 720 F. Supp. 2d 1073, 1082-83 (D. Minn. 2010) (fact issue existed as to whether applicant with a hearing impairment posed a "direct threat" to other workers for purposes of affirmative defense); *EEOC v. Hussey Copper Ltd.*, 696 F. Supp. 2d 505, 520 (W.D. Pa. 2010) (denying employer's motion for summary judgment based on claim that recovered drug addict presented a direct threat); *Doe v. Deer Mountain Day Camp, Inc.*, 682 F. Supp. 2d 324, (S.D.N.Y. 2010) (camp failed to establish that its threat evaluation with regard to rejected academy applicant, who was infected with HIV in which they determined that there was danger that applicant could transmit his condition to other campers, was objectively reasonable, as would support their "direct threat" defense to applicant's claims under the ADA); *E.E.O.C. v. Burlington Northern & Santa Fe Ry. Co.*, 621 F. Supp. 2d 587, 602 (W.D. Tenn. 2009) (genuine issue of material fact, as to whether railroad's decision that a train conductor with a prosthetic limb posed direct safety threat was objectively reasonable, precluded summary judgment for employer on ADA claim based on direct threat defense); *E.E.O.C. v. E.I. DuPont de Nemours*, 347 F. Supp. 2d 284, 298 (E.D. La. 2004) (denying employer's motion for summary judgment on the direct threat defense as to an employee who allegedly was unable to evacuate the employer's plant, such that she would be a danger to herself if an emergency occurred), *aff'd*, 480 F.3d 724 (5th Cir. 2007).

43.     TOH has no chance of prevailing on its "direct threat" affirmative defense.  The facts here demonstrate that TOH excluded Ally from the job she held for five years, and that the exclusion was not based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence, and upon an expressly

individualized assessment of the individual's present ability to safely perform the essential functions of the job." *Echazabal*, 536 U.S. at 86, 122 S. Ct. at 2053 (internal quotation marks and citation omitted). Not only did Ally perform her same job for five years, but also she performed it very well. Documents demonstrating some of the compliments and commendations Ally received from TOH and TOH's patients are attached hereto as Exhibit A. They prove beyond all doubt that Ally was an outstanding nurse at TOH. Indeed, TOH itself put in writing that "[b]ecause of employees like you, patients at Texas Orthopedic Hospital receive **safe** quality care." (Ex. A at page 5) (bold added). This explains why TOH cannot and does not claim Ally was truly not qualified for her job, but instead is reduced to making a long-shot "direct threat" argument.

44.     First, TOH's "direct threat" defense fails because there is no proof that TOH considered all of the relevant factors in a direct threat analysis on an individualized basis, much less satisfied them: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm. 29 C.F.R. § 1630.2(r); *Echazabal v. Chevron USA, Inc.*, 336 F.3d 1023 (9th Cir. 2003) (rejecting "direct threat" defense and finding that the lack of individualized assessment by doctors familiar with plaintiff's condition under the four direct threat factors was insufficient to conclude that the plaintiff was medically unfit for the job under the ADA); *Lowe v. Ala. Power Co.*, 244 F.3d 1305, 1309 (11th Cir. 2001) (the decision must be based upon "particularized facts using the best available objective evidence as required by the regulations."); *Eldredge*, 809 F. Supp. 2d at 1033 (denying employer's motion for summary judgment based on the direct threat defense because whether the plaintiff ever received an individualized assessment that complied with the ADA was in dispute).

45.     Second, TOH's "direct threat" defense fails because TOH cannot demonstrate that any supposed threat Ally presented to herself could not be eliminated by reasonable accommodation. *See, e.g., Hibbing Taconite Co.*, 720 F. Supp. 2d at 1082-83 (employer's failure to make such a demonstration defeated its "direct threat" defense on summary judgment).  Ally repeatedly sought reasonable accommodations from TOH.  Ally sent Greathouse an e-mail expressly telling him that ". . . again I am not asking you to change the cleaning products the facility uses.  All I am asking as in the past five years I have worked here is not to do major cleaning when I am here."  (Ex. E).  Ally also hand delivered to Greathouse a document that expressly notified Greathouse of her of her request for accommodation under the ADA (Ex. D). Yet, TOH failed to consider numerous reasonable accommodations.  Instead, TOH irrationally aborted its prior five years of reasonable accommodations and raced to a nonsensical termination decision in violation of the ADA. *See Chevron Phillips Chemical Co.*, 570 F.3d at 621-25 (reversing summary judgment for employer in ADA case where employer's illogical behavior was not as blatant as TOH's); *Cutrera*, 429 F.3d at 113 (reversing summary judgment where employer terminated employee before completing interactive process); *Rizzo*, 84 F.3d at 762 (reversing summary judgment for the employer where the employer admitted that it removed the plaintiff from her job because of her disability and failed to establish that her disability presented a direct threat of harm to anyone).

46.     Had TOH properly engaged in and completed the interactive process in good faith, Ally would still be employed because – as Ally herself told the Company before she was fired – many obvious reasonable accommodations were available.  Under the ADA:

The term "reasonable accommodation" may include—

(A)     making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

-17-

(B)     job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).

47.     Here, there were several obvious possible reasonable solutions or accommodations.   The most obvious thing to do would be to have reasonably accommodated Ally in the same way that TOH's prior management had for the prior five years, by:

- • Scheduling her off work when heavy cleaning was being done or visa-versa, which was not frequent.

- • Allowing her to take job-protected FMLA or other time off of work under the FMLA – which TOH already knew Ally was covered by – when necessary.[1]

- • If construction or heavy cleaning was being done on the 3rd Floor (where she normally worked), allowing her to work temporarily on the 1st Floor.

- • Having the Respiratory Therapist at TOH to give her breathing treatments using a nebulizer.

- • Coworkers would switch responsibility for patients' rooms if one of the patients Ally was responsible for had strong odors in the room from especially strong flowers or perfume.

48.     These accommodations had been granted in the past by TOH, and imposed no undue hardship on TOH. To the contrary, they benefitted TOH by retaining a valuable employee and by demonstrating TOH's commitment to the ADA, fair play, and compassion.   That TOH permitted Ally to work in this fashion for so long, and that she did so successfully, is strong

---

[1]     Under both the ADA and Texas Labor Code a temporary leave of absence may, in some circumstances, be a reasonable accommodation. *See McNamara v. Tourneau, Inc*., 496 F. Supp. 2d 366, 376 (S.D.N.Y. 2007) ("In some circumstances, a temporary inability to work may not be a bar to a disability claim; for example, an unpaid leave of absence can be a reasonable accommodation under the ADA . . . .") (citing *Graves v. Finch Pruyn & Co*., 457 F.3d 181, 185-86, nn. 5, 6 (2d Cir. 2006); *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1136 (9th Cir. 2001); *Garcia-Ayala*, 212 F.3d at 649-50); *Cehrs v. Ne. Ohio Alzheimer's Research Ctr*., 155 F.3d 775, 783 (6th Cir. 1998) (finding a genuine issue of fact existed as to whether granting further medical leave would have constituted a reasonable accommodation).  In 2009, and prior years, TOH's prior management recognized this and gave Ally time off – typically very short amounts of time – as reasonable accommodations under the FMLA (Ex. B).

evidence that it would have been reasonable for TOH to continue to have allowed these accommodations and that its failure to have done so violated the ADA.  *See Rizzo v. Children's World Learning Centers, Inc.*, 173 F.3d 254 (5th Cir. 1999) ("*Rizzo II*"), *aff'd on reh'g*, 213 F.3d 209 (5th Cir.) ("*Rizzo III*"), *cert. denied*, 121 S. Ct. 382 (2000) (fact that employee safely worked in bus driver position for twelve years with hearing disorder was strong evidence that hearing disorder did not render her somehow unqualified for the position).  As the Seventh Circuit Court of Appeals held in ruling for the plaintiff in an ADA case:

> Miller's request for reasonable accommodation did not ask IDOT to do anything it was not already doing (or, at least, anything it had not been doing up until March 2006).  The record on summary judgment, taken in the light reasonably most favorable to Miller, does not compel a finding that IDOT required every employee working as a highway maintainer on a bridge crew to be able to work in an exposed or extreme position above 25 feet in the air or that being able to do so was an essential function of the job.  To the contrary, the record confirms that it was a regular occurrence for individuals on the bridge team to share and swap tasks according to their individual capacities, abilities, and limitations.  Miller's request that task assignments be adjusted among the bridge crew members so that he would not be confronted with a task requiring him to work above 25 feet in an exposed or extreme position did not amount to a request that another member of the team perform an essential, non-delegable task.  **A jury should be permitted to consider Miller's actual work environment and IDOT's past flexibility in delegating tasks amongst the bridge team members in deciding whether Miller's request for accommodation was reasonable.**

*Miller v. Illinois Dept. of Transp.*, 643 F.3d 190, 200 (7th Cir. 2011) (citation omitted).   (bold added).

49.     In a similar vein, the fact that Ally had successfully worked as a registered nurse in numerous hospitals since 1993, despite her lifelong asthma, even further proves the point that any supposed direct threat could have been eliminated through a reasonable accommodation of the sort that TOH itself had previously provided to Ally.  As the *Hibbing* court stated in addressing the same evidentiary dynamic:

> The evidence indicates that Edstrom operated heavy machinery at LTV for nine years and was able to communicate with co-workers and supervisors with limited

radio use, hand signals, eye contact, horn use, and written communication. **The very fact that he successfully worked at the LTV mine pit is strong evidence that a reasonable accommodation could have been possible.** *See Canny v. Dr. Pepper/Seven-Up Bottling Group, Inc.*, 439 F.3d 894, 901-02 (8th Cir.2006) (holding that evidence that the plaintiff had successfully performed the required work in the past was "sufficient for a reasonable jury to conclude [plaintiff] could perform the essential functions of the [position]"); *Sprague v. United Airlines, Inc.*, No. Civ. A. 97-12102, 2002 WL 1803733, at *12 (D. Mass. Aug. 7, 2002) (noting that a hearing-impaired mechanic demonstrated that he was qualified for a position with reasonable accommodation in part because he had successfully performed work as a mechanic with a previous employer); *EEOC v. Houston Area Sheet Metal Joint Apprenticeship Comm.*, No. Civ. A.H.-00-3309, 2002 WL 1263893, at *8 (S.D. Tex. May 31, 2002) (finding a question of fact as to whether a hearing-impaired plaintiff could be reasonably accommodated at a sheet metal construction apprenticeship program through writing notes, gesturing, body shifting, and head nodding when such accommodations had been successful at a previous job).

*Hibbing*, 720 F. Supp. at 1080-81 (footnotes omitted, bold added).

50.    In addition, TOH could have simply transferred Ally to another HCA owned hospital.[2]  TOH itself essentially admitted as much after it fired Ally by introducing her to an internal HCA recruiter, Lisa Waters, so that Waters could supposedly assist her in finding a job with another HCA owned hospital.  It is telling that TOH's position statement said nothing about the fact that it introduced Ally to Ms. Waters so she could obtain a job in another HCA owned hospital.  There is no question that it happened – a copy of Ms. Waters' card, that was given to Ally, is attached hereto as Exhibit G.  TOH did not mention this fact because it is yet another example of TOH's fuzzy thinking – if Ally could work at another hospital, she could have worked at TOH, or just been transferred to such a hospital.  In other words, there is no reason TOH could not have transferred Ally to another facility in the first place, instead firing her.  TOH's failure to do so violated the ADA.  *See Davis v. City of Grapevine*, 188 S.W.3d 748 (Tex.

---

[2]      HCA has hospital operations throughout the Houston area.  Employees have transferred from one facility to another before.  *See* EEOC Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act Q&A No. 27, 915.002 (Oct. 17, 2002) (addressing such internal transfers as a possible means of reasonable accommodation).

App.–Fort Worth 2006, pet. denied) (holding that under the Texas Labor Code an employer is obligated to give a vacant position to a disabled employee as a reasonable accommodation if it is consistent with his medical restrictions and he is qualified for the job); *Jenkins v. Guardian Indus. Corp.*, 16 S.W.3d 431 (Tex. App.–Waco 2000, pet. denied) (company obligated to consider various options in assessing viability of reasonable accommodation).   Indeed, Ally herself had suggested that very alternative, and Saver told her that that was not possible because TOH did not want to pass TOH's problem on to another facility – a statement contradicted by TOH's own subsequent conduct, and grossly inconsistent with Fifth Circuit case law directly on point.  *See, e.g.*, *See Riel v. Electronic Data Systems Corporation*, 99 F.3d 678, 684 (5th Cir. 1997) (reversing summary judgment in ADA reasonable accommodation case where employer denied plaintiff's request for a transfer based on the same rationale that Saver articulated).[3]

51.     Finally, TOH may not hide behind Dr. Amran's note to avoid liability in this case. In *Bragdon v. Abbott*, 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998), the Supreme Court considered a direct threat defense presented by a dentist concerned about treating an HIV-infected patient.  The Court stated that the health care provider had a duty to assess the risk based on "the objective, scientific information available to him and others in his profession." *Id.* at 649, 118 S. Ct. 2196. A subjective belief in the existence of a risk, even one made in good faith, will not shield the decisionmaker from liability. *Id.*  Instead, an employer must gather "substantial information" about an employee's work history and medical status in performing the required direct threat analysis.  *Echazabal*, 336 F.3d at 1028.

---

[3]     TOH also could have gone to organic cleaning chemicals (not just vinegar and water, as TOH incorrectly claims in its position statement), as other hospitals have around the country.  Ally suggested that to Mr. Greathouse. He said he would look into it, but – consistent with TOH's failure to meaningfully engage in the interactive process – he never spoke to Ally about it again.

52.     It thus follows that TOH "was required to do more than consider generalized statements of potential harm." *Echazabal*, 336 F.3d at 1030.   Rather, before taking action against Ally based on Dr. Amran's note, TOH was required to gather "substantial information" about Ally's work history and medical status and "was [also] required, under the terms of 29 C.F.R. § 1630.2(r), to consider the severity, imminence, and potential likelihood of harm." *Echazabal*, 336 F.3d at 1028-30.   TOH did not do that.

53.     TOH selected Dr. Amran – a health nurse from TOH called Ally at home and directed her to Dr. Amran.   There is no proof that Dr. Amran performed an "individual assessment" of Ally applying the factors set forth in 29 C.F.R. § 1630.2(r), as required by the ADA.   There is no evidence that TOH ever even provided Dr. Amran with the relevant regulatory factors, so he could consider them.   Furthermore, to Ally's knowledge, TOH did not provide Dr. Amran a job description, or any other information about her work history.   Ally had never seen him before, and she has never seen him since.   This hardly satisfies the demanding standards set about above.

54.     Moreover, most importantly, Ally had been safely and adequately performing the very job at-issue for the prior five years – and was performing it adequately on the very day Dr. Amran wrote his note.   Given these indisputable facts, it defies common sense, much less the ADA, to conclude, as TOH did, that Ally was somehow suddenly not medically fit for the job, and to terminate her on that wrongheaded and illegal basis. *See Echazabal*, 336 F.3d at 1030-32 (rejecting "direct threat" defense and finding that the lack of individualized assessment by doctors familiar with plaintiff's condition under the four direct threat factors was insufficient to conclude that the plaintiff was medically unfit for the job under the ADA); *Lowe*, 244 F.3d at

1309 (the decision must be based upon "particularized facts using the best available objective evidence as required by the regulations.").

55.     This case is similar in important respects to the facts of *Rodriguez v. ConAgra Grocery Products Co.*, 436 F.3d 468 (5th Cir. 2006).  There, the plaintiff worked as a temporary worker for ConAgra for approximately one month.  ConAgra wanted to hire him as a direct employee, but its doctor concluded that he was "unfit for duty" because of his diabetes.  The plaintiff brought an ADA claim against ConAgra, alleging that ConAgra refused to hire him after the doctor wrongly declared him "unfit for duty."  The district court determined there was no disability discrimination because ConAgra withdrew the job offer based on the physician's assessment. The Fifth Circuit reversed, and rendered judgment for the plaintiff, because: (1) the physician did not have enough information to find that the plaintiff's diabetes was uncontrolled; and (2) ConAgra did not have enough information to conclude he was unable to perform the job.

56.     The Fifth Circuit explained that the physician's finding was based on one urinalysis and the plaintiff's inability to remember the name of his diabetes medication.  Essentially, the physician leapt to the conclusion that the plaintiff was not taking his medication because he could not remember its name.  Neither the physician nor ConAgra had any evidence that the plaintiff did not take his medication, and the plaintiff had no history of complications from diabetes.

57.     The Fifth Circuit held that ConAgra's decision not to hire the plaintiff ignored the ADA's mandate that an employer must consider an impaired applicant on the basis of actual abilities.  The court observed that the plaintiff's temporary work with ConAgra of about a month showed that he could do the job.  The Fifth Circuit found that ConAgra should have considered that fact, rather than deferring to the physician's thinly supported assessment.  In short, the court

found that ConAgra's decision amounted to improper speculation about the hypothetical risks posed by an uncontrolled diabetic.  As a result, the Fifth Circuit reversed the summary judgment for the employer and entered judgment for the plaintiff.

58.    *ConAgra* teaches that an employer may not blindly rely on the results of medical examinations to exclude persons from jobs.  Instead, each situation must be carefully considered.  As the *ConAgra* court held, "[a]n employer cannot slavishly defer to a physician's opinion without first pausing to assess the objective reasonableness of the physician's conclusions."  It also teaches that there is an obligation on the employer's part to resolve any conflict between the physician's assessment and what the company knows about the applicant's ability to do the job based on prior experience.  TOH violated both of these teachings in this case.

59.    Here, under the ADA, the strict requirements of the "direct threat" defense, and *ConAgra*, it is abundantly clear that TOH violated the law when it terminated Ally from the very same job she had been successfully performing for the past five years.  *Id*.  In *ConAgra*, the Fifth Circuit concluded that the plaintiff's mere approximately one month of satisfactory work in the position put the company on notice that the doctor's conclusion that he was unfit to do the job was incorrect.  Here, Ally had been satisfactorily performing the job for five years, so her ADA case is even stronger than the plaintiff's winning ADA case in *ConAgra*.

**D.    Fourth Element: TOH Chose To Terminate Ally Rather Than Making Any Reasonable Accommodations**

60.    The ADAAA states that the intent of its changes is that employers stop engaging in "extensive analysis" to determine what constitutes a disability under the law, and focus instead on complying with their obligation not to discriminate and to provide reasonable accommodations to individuals who are otherwise qualified to do a job.  TOH failed badly in this regard.

61.     The Fifth Circuit has recognized that "where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, the initial burden rests primarily upon the employee ... to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations." *Chevron Phillips Chemical Co.*, 570 F.3d at 621 (citation omitted).  Once an employee makes such a request, however, the employer is obligated by law to engage in an "interactive process": "a meaningful dialogue with the employee to find the best means of accommodating that disability." *Id.* (citation omitted).  The process thus requires "communication and good-faith exploration."  *Id.* (citation omitted).

62.     Here, TOH failed to consider numerous reasonable accommodations.  This is especially inexcusable because Ally had told Sarver, Stewart, and Greathouse that she could be reasonably accommodated in the same way she had been between June 2005 and mid-2010, and had even offered some additional suggestions for reasonable accommodations, such as a transfer to another HCA owned facility or removing harsh cleaning chemicals from TOH and going to organic cleaning chemicals, as other hospitals across the country had done.  TOH considered and implemented none of these reasonable accommodations.  Instead, TOH irrationally aborted its prior five years of reasonable accommodations and raced to a nonsensical termination decision. *See supra*.

63.     Where, as here, an employer does not engage in a good faith interactive process, that employer violates the ADA – including when the employer discharges the employee instead of considering the requested accommodations. *Id.* (citing *Cutrera*, 429 F.3d at 113 ("An employer may not stymie the interactive process of identifying a reasonable accommodation for an employee's disability by preemptively terminating the employee before an accommodation

can be considered or recommended.").  Based on the facts set forth above, such was the case here.  As a result, TOH violated the ADA.  *See Cutrera*, 429 F.3d at 113.  There is no need for further analysis:  This alone establishes liability. *See, e.g.*, *Chevron Phillips Chemical Co.*, 570 F.3d at 621-22; *Cutrera*, 429 F.3d at 113.

64.     It is noteworthy, however, that, had TOH properly engaged in and completed the interactive process in good faith, Ally would still be employed because – as Ally herself told the Company before she was fired – and as set forth in detail above, many reasonable accommodations were available.  *See supra*.

## V.   ADA/TEXAS LABOR CODE DISCRIMINATION CLAIM

65.     Aside from the failure to reasonably accommodate claim described above, a reasonable jury could conclude that TOH simply terminated Ally – a disabled and "qualified employee" under the ADA – because of her disability and/or requests for reasonable accommodations,[4] as in *Chevron Phillips Chemical Co.*, 570 F.3d at 621-25 and *Cutrera*, 429 F.3d at 113. As the *Carmona* case sets out, there are three elements of an ADA/Texas Labor Code disability discrimination claim. *Carmona*, 604 F.3d at 854.  The plaintiff: (i) must have a disability; (ii) he or she must be a qualified individual for the position (meaning he or she can perform the position's essential functions with or without reasonable accommodation); and (iii) he or she must demonstrate that their disability was a motivating factor in their termination. *Id*.

## A.     First Element: Ally Has A Disability

66.     For the reasons set forth above, there is no doubt that Ally was disabled as defined by law as a result of her asthma.

---

[4]     Here, Ally is in fact disabled under the amended ADA.  Even if she were not, she would still have a claim. This is so because every circuit court to address the issue has also held that it is unlawful to discharge an employee for requesting an accommodation under the ADA, even if that employee is not disabled, so long as they reasonably believed that they were covered by the ADA.  *See Chevron Phillips Chemical Co.*, 570 F.3d at 620 n. 9.

**B.**   **Second Element: Ally Was A Qualified Individual For Her Position**

67.   For the reasons set forth above, there is no doubt that Ally was a qualified individual for her position as defined by the law.

**C.**   **Third Element: Ally's Disability Was A Motivating Factor In The Decision To Terminate Her Employment**

68.   There is no doubt that TOH terminated Ally because of the workplace limitations caused by her asthma – it admitted that very thing in her termination meeting, and on page five of its position statement to the EEOC, thus providing "direct evidence" of its discriminatory intent. *See, e.g., Rizzo v. Children's World Learning Ctrs., Inc.*, 84 F.3d 758, 762 (5th Cir. 1996) ("In the instant case there is direct evidence that Children's World made an employment decision because of a disability.  Children's World does not deny that Rizzo was removed from driving duties because of her hearing impairment. Therefore, we need not engage in the *McDonnell Douglas* presumptions in order to infer discrimination: Children's World admits that it discriminated.").

69.   The Fifth Circuit has found that similar facts – and frankly even weaker facts – are sufficient to find intentional disability discrimination under the ADA. *See Carmona*, 604 F.3d at 859-63 (upholding jury verdict for ADA plaintiff who was less clearly qualified for the job than Ally); *Chevron Phillips Chemical Co.*, 570 F.3d at 621-25 (reversing summary judgment for employer in ADA case where employer's illogical behavior was not as blatant as TOH's); *Cutrera*, 429 F.3d at 113 (reversing summary judgment where employer terminated employee before completing interactive process); *Rodriguez*, 436 F.3d at 481-83 (reversing summary judgment and rendering judgment for employee where employer removed employee from job that he had successfully been doing for a month, not years, based on a similarly illogical conclusion that a medical condition rendered him somehow unqualified for the job);

*Rizzo*, 84 F.3d at 762 (reversing summary judgment for the employer where the employer admitted that it removed the plaintiff from her job because of her disability and failed to establish that he disability presented a direct threat of harm to anyone else).

70.     TOH's violation of Ally's right under the ADA stems from its managers' fundamental misunderstanding of the ADA.   The facts set forth above reflect that misunderstanding.   So does the fact that, when Ally requested accommodations from Saver, he told her that TOH could not do anything special for her, because that would allegedly show impermissible "favoritism" on the floor.   Saver's "argument echoes the classic rejoinder of bureaucrats throughout history:   If I make an exception for you, I'll have to make one for everybody, so no exceptions."   *Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418, 436, 126 S.Ct. 1211, 1223 (2006) (Roberts, J.).   Mr. Saver's statement – and the rest of TOH's new management's conduct towards Ally – reveals a sad misunderstanding of the ADA.   A primary purpose and requirement of the ADA is to require employer's to make special exceptions when it would be reasonable to do so, rather than to reflexively rely on ordinary workplace policies or practices.   *See, e.g.,* 42 U.S.C. § 12111(9); *Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 648-49 (1st Cir. 2000) (making exception to normal maximum one-year leave of absence policy was required by ADA's reasonable accommodation mandate, and employer's failure to make exception violated ADA); *Cleveland v. Prairie St. Coll.*, 208 F. Supp. 2d 967, 978-79 (N.D. Ill. 2002) (fact issue on whether modification of policy would have been reasonable under the circumstances); EEOC Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act Q&A No. 24, 915.002 (Oct. 17, 2002). ("It is a reasonable accommodation to modify a workplace policy when necessitated by an individual's disability-related limitations, absent undue hardship.") (footnote

omitted). Congress determined that the legislated test is a workable test for striking sensible balances between the needs of disabled workers and the legitimate interests of employers. TOH has no right to overrule what Congress has already decided.

## VI.  JURY DEMAND

71.     Ally demands a jury trial.

## VII.   CONDITIONS PRECEDENT

72.     Ally has satisfied all conditions precedent necessary to file this suit. Likewise, Ally has satisfied all necessary administrative prerequisites to filing this suit, under both the ADA and the Texas Labor Code.

73.     Ally filed her Charge of Discrimination with the EEOC and the Texas Workforce Commission – Civil Rights Division well within 180 days of the adverse employment actions made the basis of this lawsuit.

74.     Ally's lawyer received a Right To Sue letter from the EEOC on Saturday, September 29, 2012, and has filed this lawsuit well prior to the expiration of 90 days therefrom.

75.     Ally requested a Right To Sue letter from the Texas Workforce Commission – Civil Rights Division on Monday, October 1, 2012, and her lawyer received the letter on Saturday, October 6, 2012.   Ally has filed this lawsuit well prior to the expiration of 60 days from her lawyer's receipt of the aforementioned letter.

## VIII.  DAMAGES

76.     Ally has suffered lost back-pay and front-pay, including lost benefits and related damages.

77.     Ally has suffered compensatory damages, including "emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary

losses." 42 § 1981a(b)(3).  *See, e.g., Giles v. General Electric Co.*, 245 F.3d 474, 489 (5th Cir. 2001) (awarding $150,000.00 compensatory damages award in ADA case).

78.     TOH acted with malice or reckless disregard of Ally's rights under the ADA and the Texas Labor Code, thus justifying the imposition of punitive damages.  42 U.S.C. § 1981a(b)(1).  *See, e.g., E.E.O.C. v. E.I. Du Pont de Nemours & Co.*, 480 F.3d 724, 733-34 (5th Cir. 2007) (upholding $300,000.00 punitive damages award in an ADA case).

## IX.  PRAYER

Ally asks that the Court issue citation for Defendant TOH to appear and answer, and that Ally be awarded a judgment against Defendant TOH for the following:

a.     Actual damages including by not limited to pecuniary losses, non-pecuniary losses, back-pay, front-pay (or reinstatement), and compensatory damages under the ADA / Texas Labor Code;

b.     Punitive damages under the ADA / Texas Labor Code.

c.     Prejudgment and post-judgment interest;

d.     Court costs;

e.     Attorneys' fees; and

f.     All other relief to which Plaintiff is entitled.

Respectfully submitted,

OBERTI SULLIVAN LLP

By:    s/ Mark J. Oberti
        Mark J. Oberti
        State Bar No. 00789951
        S.D. Texas No. 17918
        723 Main Street, Suite 340
        Houston, Texas 77002
        (713) 401-3555 – Telephone
        (713) 401-3547 – Facsimile
        mark@osattorneys.com – Email

        ATTORNEY-IN-CHARGE FOR PLAINTIFF
        FARIDA ALLY

OF COUNSEL:

Edwin Sullivan
State Bar No. 24003024
S.D. Texas No. 24524
723 Main Street, Suite 340
Houston, Texas 77002
(713) 401-3555 – Telephone
(713) 401-3547 – Facsimile
ed@osattorneys.com – Email

ATTORNEYS FOR PLAINTIFF
FARIDA ALLY

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| FARIDA ALLY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. _____ |
| | § | |
| ORTHOPEDIC HOSPITAL LTD d/b/a TEXAS | § | |
| ORTHOPEDIC HOSPITAL, | § | |
| | § | |
| Defendant. | § | |

### AFFIDAVIT OF FARIDA ALLY

| | |
|---|---|
| STATE OF T E X A S | § |
| | § |
| COUNTY OF HARRIS | § |

On this day, personally appeared before me, the undersigned authority, FARIDA ALLY,

who upon her oath, deposes and states:

1.  My name is Farida Ally.  I am over the age of 21, competent to make this
    affidavit, and have personal knowledge that everything stated herein is true and
    correct.

2.  The statements under the heading "Factual Background" in Plaintiff's Sworn
    Original Complaint" in this case are all true and correct on my personal
    knowledge. Further, Affiant sayeth naught.

_____
FARIDA ALLY

SUBSCRIBED AND SWORN TO before me on this the 31st day of October, 2012,
certify which witness my hand and seal of office.

_____
Notary Public in and for
The State of T E X A S
Printed name: Julie M. Taylor
My commission expires: 11/25/2012

JULIE M. TAYLOR
Notary Public, State of Texas
My Commission Expires
November 25, 2012

-32-